### In re ATRIUM HIGH POINT LTD. PARTNERSHIP, Debtor.

**Bankruptcy No. B–95–10078 C–11G.**

United States Bankruptcy Court, M.D. North Carolina, Greensboro Division.

Nov. 17, 1995.

Gerald A. Jeutter, Jr. and Rebecca Henderson, Petree Stockton, Raleigh, NC, for Ohio National.

William P. Miller and Alan B. Powell, Roberson, Haworth & Reese, High Point, NC, for debtor.

## MEMORANDUM OPINION

CATHARINE R. CARRUTHERS, Bankruptcy Judge.

This matter came before the court on October 24, 1995, on Ohio National Insurance Company's ("Ohio National") (1) Continued Motion for Relief from Stay and (2) Objection to Confirmation of the Debtor's First Amended Plan, and Atrium High Point Lim-

ited's ("the Debtor") (1) Motion for Authority to Use Cash Collateral and (2) Motion to Confirm and Cram Down its First Amended Plan of Reorganization. Gerald A. Jeutter, Jr. and Rebecca Henderson appeared as attorneys for Ohio National. William P. Miller and Alan B. Powell appeared as attorneys for the Debtor.

These matters constitute a core proceeding over which this court has jurisdiction. *See* 28 U.S.C. §§ 157(b)(2)(G) and (L) and Standing Order No. 10 of the United States District Court for the Middle District of North Carolina.

Having considered the evidence offered by the parties, the arguments of counsel, and the briefs submitted by the parties, the court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. The Debtor, a Debtor in Possession, is a North Carolina limited partnership formed for the purpose of managing and leasing commercial office space in a building called the "Atrium" located on 4.14 acres in downtown High Point, North Carolina.

2. The Atrium was constructed in 1988 and consists of a two-story office building with 60,408 square feet. Of the 60,408 square feet, 56,937 is available for leasing. The building has been very well maintained and is considered Class A leasing space. It is undisputed that the property is located in an excellent location. The Atrium is the sole asset of the Debtor.

3. The Debtor is indebted to Ohio National by virtue of a Promissory Note secured by real estate (the "Note") executed March 4, 1990, in the original principal amount of $4,125,000 assumed by the Debtor and secured by a Deed of Trust and Equity Agreement ("Deed of Trust") duly recorded on March 19, 1990, in Book 3796 at Page 31, Guilford County Register of Deeds and an Assignment of Leases, Rents and Profits ("Assignment of Rents") executed March 14, 1990, and recorded March 19, 1990, in Book 3796 at Page 80, Guilford County Register of Deeds. The Deed of Trust grants Ohio National a first priority lien and security agree-

ment in all leases, rents, and profits. The Note reflected an interest rate of 9.5% with a balloon date of April 1, 1995.

4. During the year following consummation of the March 1990 loan with Ohio National, the Debtor enjoyed an occupancy rate in excess of ninety-five percent. Despite the relative success of its business, the Debtor had difficulty servicing the Note. When two of the Debtor's tenants broke their leases in March of 1991, the Debtor was compelled to seek a modification of the original Note ("First Modification") with Ohio National. As part of that modification, Ohio National agreed to advance the Debtor an additional $77,790.24 to be used to pay past due interest and upfitting expenses for new tenants. Ohio National also agreed to extend the final due date of the loan from April 1, 1995 until August 1, 1995.

5. Following the execution of the First Modification in July, 1991, the Debtor's occupancy rate rose to an impressive ninety-seven percent, where it continued to hover for the next few years. Despite the continuous flow of incoming rents, the Debtor still could not cash flow its business. In March 1992, there was a second default under the Ohio National loan due to the Debtor's failure to pay its 1991 ad valorem taxes, which became due in January 1992. Accordingly, the Debtor and Ohio National entered into a Second Modification Agreement wherein Ohio National advanced the Debtor $27,-599.90 to be used towards the satisfaction of its tax deficiency (the "Second Modification").

6. In addition to the funds obtained by the First and Second Modifications, the Debtor also looked to its partners to infuse additional money into the Atrium project. By March 1993, $720,660.97 in cash was contributed to the partnership to cover lease upfittings and monetary shortfalls from sources other than Ohio National.

7. In March 1993, a major tenant in the Atrium building defaulted on its lease. Once again, the debtor defaulted on its loan with Ohio National. Upon institution of foreclosure by Ohio National, the Debtor filed for protection under Chapter 11 of the Bankruptcy Code on March 3, 1993.

8. The Debtor's first Chapter 11 plan was confirmed on December 20, 1993. As a part of that plan, the Debtor and Ohio National executed a Third Modification Agreement ("Third Modification"). Under the terms of the Third Modification, Ohio National agreed to reduce its interest rate from 9.5% to 7.5% and to extend the due date of payment on the note from April 1, 1995, to January 1, 2001. As part of the consideration for the Third Modification, the parties agreed that "[n]either Borrower, Guarantors, nor any of their successors or assigns shall oppose any motion filed by Lender or any subsequent holder of the Loan Documents seeking relief from or modification of the automatic stay of 11 U.S.C. § 362(a) in any subsequent case of Borrower." The Debtor's Chapter 11 plan, which was approved by this court and assented to by all of the Debtor's prepetition creditors, also contained language prohibiting the Debtor from objecting to any motion to lift stay in any subsequent bankruptcy proceeding.[1]

9. Payments commenced under the first confirmed plan in January of 1994 and continued in a timely basis through November, 1994.

10. In December of 1994, Dixon, Odom & Company, one of the Debtor's principal tenants, defaulted in its lease. Dixon, Odom occupied roughly 30% (16,177 rentable square feet) of the Debtor's property. Because the Dixon, Odom lease was slated to expire in January 1995, the Debtor had already entered into a tentative agreement with another company to lease much of the square footage left vacant by Dixon, Odom. That agreement was never consummated, however, and by the end of 1994, the Debtor was faced with an $18,000 rent deficiency (representing the December rent owed by the defaulting Dixon, Odom) and only a 70% occupancy rate. Once again, the Debtor was unable to meet its operating expenses and maintain its long-term debt service.

11. On January 13, 1995, the Debtor filed a second petition for relief under Chapter 11 of the Bankruptcy Code.

12. On January 23, 1995, Ohio National filed its motion for relief from stay. A hearing on that motion was held before the Honorable Jerry G. Tart on February 14, 1995. At the hearing, the Debtor opposed the motion and presented the court with nine affidavits executed by representatives of various third-party creditors who objected to Ohio National's motion to lift the automatic stay.[2] The Debtor's attorney tendered these third-party creditors to the court so as to preserve their objections in the record, but in an effort to save time, the parties stipulated that the then present third-party creditors did indeed object to Ohio National's motion for relief from stay. Without making a final ruling on Ohio National's motion, Judge Tart determined it would be best to continue the matter for approximately four months to see if the Debtor could successfully re-let the va-

---

1. At the hearing the Debtor argued that under the terms of the Third Modification Agreement, the non-opposition clause did not actually prevent the Debtor from contesting any subsequent motion to lift stay brought by Ohio National, but only created an event of default. Although a literal reading of the Third Modification Agreement may leave such an impression, this court finds that such an interpretation is contrary to both common sense and the intended meaning of the provision.

It is apparent that if the non-opposition clause does nothing more than create an event of default, the clause is meaningless. Certainly Ohio National would not find it necessary to seek relief from the automatic stay if the Debtor remained current on its debt and did not otherwise default in its obligations under the loan documents. (In fact the Fourth Circuit case of *In re Belanger*, 962 F.2d 345 (4th Cir.1992) precludes such relief in the absence of default). To hold that the Debtor's opposition to such a motion does no more than add another event of default to Ohio National's arsenal, is to grant Ohio National a remedy without relief. There is no credible evidence tending to show that the parties intended such a result when they negotiated the terms of both the Third Modification and the Debtor's plan of reorganization. Additionally, the fact that David Jacobs, a general partner and primary leasing agent of the Debtor, admitted on cross-examination that it was his "impression" that the Debtor would not be allowed to contest the lifting of the stay, substantiates this court's finding that the non-opposition clause was intended to be a binding proscription, not just an event of default. This court so finds.

2. The court notes that of the nine objecting creditors, eight were parties to the Debtor's prior Chapter 11 proceeding and assented to the Debtor's first plan of reorganization.

cant space. Accordingly, Judge Tart held that, in the interim, Ohio National was adequately protected and the court continued the matter until a later date.

The parties entered into a consensual order on February 3, 1995, for the use of cash collateral (the "Cash Collateral Order") and have been operating under that order since that date. From time to time, the motion to continue to use cash collateral and the motion to lift stay have been back on the court's calendar. These motions were consensually continued until the hearing on plan confirmation.

13. The Debtor filed its First Amended Disclosure Statement and its First Amended Plan of Reorganization on July 25, 1995. The Disclosure Statement and Plan were transmitted to creditors for voting. All classes voted in favor of the Plan except Ohio National. As a part of that plan, the Debtor proposes to operate the property pursuant to a Cash Collateral Order previously entered by this court. Under the Cash Collateral Order, all rental payments will be applied towards the Debtor's operating expenses; any remaining net rentals will be applied to the Third Modified Loan. This arrangement will continue until December 31, 1996, when all shortfalls occurring in interest and principal due Ohio National under the Third Modified Loan will be capitalized at the then current corresponding five-year Treasury Note rate plus two hundred basis points and amortized over a ten-year payment schedule.[3] Regular payments under the Third Modification documents with Ohio National are to commence beginning January 1, 1997 through December 31, 1998, at which time the unpaid outstanding balance of principal and interest will balloon and become payable in full. The expected balloon payment is $4,236,541.65. The Debtor is proposing an accelerated balloon date of December 31, 1998, whereas the Third Modification had a balloon date of January 1, 2001.

14. The Debtor's proposed plan of reorganization does not provide for any additional cash infusion by its partners. The partners' equity interest in the Debtor will remain unchanged. Ohio National would continue to

hold personal guaranties of J.W. Ballington, Jr. and David H. Jacobs. No evidence was presented as to the strength of these guaranties.

15. The current rate of occupancy of the Atrium building is just over seventy-nine percent. Roughly two thirds of the square footage that lay vacant at the time the Debtor filed its petition for relief in January 1995 is still vacant.

16. The Debtor believes the only reason it is now in Chapter 11 is because of the expiration of one of the Debtor's largest and most lucrative leases and the reduction in cash flow that resulted therefrom. In order to prevent similar shortfalls in the future, the Debtor will no longer lease its available space to large tenants requiring thousands of square feet of office space. Instead, the Debtor will seek out multiple smaller users so as to prevent the kind of economic disruption that inevitably results when a large tenant vacates the premises.

17. Since the petition date the Debtor has entered new leases for 6,053 rentable square feet and is working with additional prospects and existing tenants in their space expansion plans. The Debtor expects to attain a 100% occupancy rate by the end of 1996. From this court's perspective, the Debtor's economic future is not so optimistic. The uncontroverted evidence demonstrates that one major tenant has a lease for 9,258 square feet which will expire in December 1995; three of the present leases have expired and are on a month-to-month basis; and one of the present leases is with an entity that is in itself operating in a Chapter 11 proceeding, and the debtor in that case has not, as of yet, assumed or rejected the lease.

18. The total amount presently due Ohio National is $4,283,497.73. Because virtually all of the income generated from the Atrium project will be required to fund the plan and to keep the Debtor operating, the Debtor proposes to pay off Ohio National on December, 31 1998 by either selling the property or by refinancing.

---

3. The evidence presented anticipated a shortfall of at least $152,495.00.

19. Ronald Crowder, a witness for the Debtor, appraised the subject property at $5,000,000. However, Mr. Crowder's appraisal reflected a total rentable area of 60,000 square feet and a 90% occupancy rate. When figures representing a total rentable area of 56,000 square feet at an 80% occupancy rate (values more in line with the reality of the Debtor's situation) are factored into the appraisal formula utilized by Mr. Crowder, the fair market value of the Atrium building is somewhere near $3,450,000.[4]

20. It is generally the standard in the industry for banks to loan no more than seventy-five to eighty percent of the value of property securing a loan. Thus, even if the property is worth $5,000,000 as was testified to by Mr. Crowder, the most that a bank would be willing to loan against the property is $4,000,000. It is, therefore, highly speculative that the Debtor will, in fact, be able to find another bank that would be willing to finance this debt. Whether the Debtor will find a buyer to purchase the property by December 31, 1998 is also subject to conjecture.

21. Any conclusion of law that should more appropriately be denominated as a finding of fact is incorporated herein by reference.

## DISCUSSION

### A. Relief from the Automatic Stay

■ The Bankruptcy Code provides that the filing of a petition under Chapter 11 of the Code operates as an automatic stay of most activity against the debtor's property, including actions to realize the value of collateral securing an obligation of the debtor. 11 U.S.C. § 362(a). The purpose of the automatic stay is well known. It stops all collection efforts and gives the debtor a "breathing spell" so he can be relieved of the pressures that drove him into bankruptcy and attempt to develop a repayment or reorganization plan that will satisfy his outstanding debts. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 340 (1977). *See also In re Sky Group Int'l, Inc.,* 108 B.R. 86, 88 (Bankr.W.D.Pa.1989).

■ Although the scope of the automatic stay is broad, its shield does not always protect the debtor throughout the pendency of the bankruptcy case. Rather, in an effort to harmonize the interests of both debtor and creditors, the Code specifically allows creditors to seek relief from the automatic stay under 11 U.S.C. § 362(d). That section provides:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . ., such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
>
> (2) with respect to a stay of an act against property under subsection (a) of this section, if—
>
> > (A) the debtor does not have equity in such property; and
> >
> > (B) such property is not necessary for an effective reorganization.

Acknowledging that the Debtor probably does have some equity in the subject property, Ohio National seeks relief from the automatic stay under section (d)(1) of section 362(d). Ohio National argues there is sufficient "cause" to lift the stay because of a prepetition agreement and prior plan treatment between it and the Debtor wherein the Debtor agreed that it would not oppose any motion by Ohio National seeking relief from the automatic stay.

A number of bankruptcy courts have considered the issue of the enforceability of prepetition agreements waiving a Debtor's right to enjoy the protections of the automatic stay. While a handful of those courts have concluded that such prepetition waivers are valid and enforceable, others disagree. *In re Powers,* 170 B.R. 480 (Bankr.D.Mass.1994) (enforcing prepetition waiver agreement); *In re Cheeks,* 167 B.R. 817 (Bankr.D.S.C.1994) (same); *In re Club Tower, L.P.,* 138 B.R. 307 (Bankr.N.D.Ga.1991) (same); *In re Citadel Properties, Inc.,* 86 B.R. 275 (Bankr.M.D.Fla. 1988); *but see, In re Jenkins Court Assoc. Ltd. Partnership,* 181 B.R. 33 (Bankr.

---

**4.** The property should appreciate in value over the next few years.

E.D.Pa.1995) (refusing to enforce a prepetition waiver agreement); *Farm Credit of Cent. Florida, ACA v. Polk,* 160 B.R. 870 (M.D.Fla.1993) (same); *In re Sky Group Int'l, Inc.,* 108 B.R. 86 (Bankr.W.D.Pa.1989) (same).

Those courts holding that prepetition waivers are valid and enforceable tend to espouse the view that enforcing such agreements furthers the legitimate public policy of encouraging out-of-court restructuring and settlements. *In re Cheeks,* 167 B.R. 817, 818 (Bankr.D.S.C.1994) ("Perhaps the most compelling reason for enforcement of the [prepetition waiver] is to further the public policy in favor of encouraging out-of-court restructuring and settlement.... Bankruptcy courts may be an appropriate forum for resolving many of society's problems, but some disputes are best decided through other means.") (citation omitted). *See also In re Powers,* 170 B.R. 480, 483 (Bankr.D.Mass. 1994) (quoting *In re Cheeks,* 167 B.R. 817, 818 (Bankr.D.S.C.1994); and *In re Club Tower, L.P.,* 138 B.R. 307, 311 (Bankr.N.D.Ga. 1991)).

The arguments against the enforceability of prepetition waivers of the automatic stay can be separated in two categories: First, in the context of a "single asset case," one court has focused on the practical similarity between bargained-for prepetition waivers of the automatic stay and consensual restraints against filing for bankruptcy in the first place. *In re Jenkins Court Assoc. Ltd. Partnership,* 181 B.R. 33 (Bankr.E.D.Pa.1995). As a starting point, the court in *In re Jen-*

kins correctly points out that ipso facto clauses precluding a debtor's right to file for bankruptcy are *per se* invalid. *Id.* at 36. *See also In re Weitzen,* 3 F.Supp. 698 (S.D.N.Y.1993). The decision then goes on to illustrate how, in a single asset case, a waiver of the automatic stay is functionally equivalent to a blanket prohibition against a bankruptcy filing. As stated by Judge Raslavich:

> A prepetition waiver of the automatic stay may be simply a tailored form of relief, but its impact can be tremendous. Here—as in many "single asset cases," enforcement of the Debtor's prepetition waiver of the protection of the automatic stay could quickly foretell the end of the Debtor's case. If the Debtor's single asset, i.e., the Project, passes from the bankruptcy estate through foreclosure, the Debtor, it can easily be seen, will have no realistic opportunity to attempt to formulate a repayment or reorganization plan.

*In re Jenkins,* 181 B.R. at 37.[5]

Second, other courts have bottomed their decisions not to uphold pre-petition waivers of the automatic stay on the ground that the stay is designed not only to protect debtors, but also serves to protect creditors and insures that all creditors are treated equally. As one court explains, "the automatic stay provision is intended to preclude the opportunity of one bankruptcy creditor to pursue a remedy against the debtor to the disadvantage of other bankruptcy creditors and thus to promote the orderly administration of the

---

**5.** The Debtor relies heavily on the *Jenkins* case and argues that it is very similar to the case before this court. In *Jenkins,* the Bankruptcy Court correctly held that a prepetition waiver of the automatic stay would not be enforced absent the development of the facts. The *Jenkins* case is easily distinguishable from the case before this court. In *Jenkins,* the Debtor acquired its original loan in 1989 and entered in various modifications of the loan. A settlement agreement was entered into in July 1992, more than two years prior to the bankruptcy filing and contained the following waiver language:

> In the event the borrower files for protection under the federal Bankruptcy Code ... the lender shall immediately be entitled to relief from stay.... The fair market value is substantially less than the outstanding balance under the loan document, and so no chance of

successful reorganization of the borrower exists; and any bankruptcy in which the borrower rejects or otherwise fails to honor the foregoing agreement shall *per se* be deemed to have commenced in bad faith.

*In re Jenkins,* 181 B.R. at 35. This waiver was extreme and was certainly not approved by the Bankruptcy Court as the waiver was in this proceeding. In the case before court, the Bankruptcy Court approved the Debtor's first plan and, accordingly, sanctioned the waiver that was placed in that plan. Additionally, in *Jenkins,* the court was asked to rule on the waiver in the absence of an evidentiary hearing. Accordingly, the court in *Jenkins* correctly found that the waiver of the automatic stay in that instance too closely approximated the prohibition against filing for bankruptcy protection.

bankrupt's estate." *Farm Credit of Cent. Florida, ACA v. Polk,* 160 B.R. 870, 873–74 (M.D.Fla.1993). Thus, the argument goes, if the courts are willing to enforce prepetition waivers of the automatic stay for the benefit of a single creditor, the security the Code provides for all other creditors will be jeopardized.

■ As the cases demonstrate, there are strong arguments both for and against the enforceability of bargained-for prepetition waivers of the automatic stay. For reasons outlined below, this court believes that such prepetition waivers are enforceable in appropriate cases.

■ With regard to the argument that in a single asset case a prepetition waiver is, for all practical purposes, a prohibition against filing for bankruptcy protection, this court adopts the rationale outlined by Judge Robinson in *In re Club Tower L.P.,* 138 B.R. 307 (Bankr.N.D.Ga.1991):

> ... Debtor agreed to and did in fact waive a single benefit of the Bankruptcy Code, not all of the rights and benefits provided by the Code as is the case where a borrower agrees to waive its right to file bankruptcy. Moreover, debtor has already received the benefit of the automatic stay because [the secured creditor] has been and presently is stayed from enforcing its rights under the Loan Documents. No provision in the Bankruptcy Code guarantees a debtor that the stay will remain in effect throughout the bankruptcy case.

Furthermore, Debtor still retains the benefits of the automatic stay as to the other creditors, as well as all the other benefits and protections provided by the Bankruptcy Code including but not limited to the right to conduct an orderly liquidation, discharge debt or pay it back on different terms, assume or reject executory contracts, sell property free and clear of liens, and pursue preferences and fraudulent conveyances. Debtor still retains the core rights under the Bankruptcy Code and has the ability to make a "fresh start." Therefore, enforcing Debtor's agreement does not violate the public policy concerns that agreements which prohibit a borrower from filing for bankruptcy violate.

*Id.* at 311–12. Like the debtor in *In re Club Tower L.P.,* the Debtor in the present case also enjoys the various protections and rights afforded by the Bankruptcy Code. Although an order of this court granting relief from stay may debilitate the Debtor somewhat, the Debtor accepted that risk when it agreed to the prepetition waiver of the automatic stay. There was no prepetition waiver in the original loan agreement or under the First or Second Modification. The agreement not to object to the motion to lift stay was bargained for under the Third Modification and under this Debtor's first confirmed plan of reorganization. The Debtor received a lower interest rate and a five-year extension of the loan. Ohio National received the Debtor's covenant not to oppose a motion to lift stay in a subsequent bankruptcy filing.

Enforcing the Debtor's agreement under these conditions does not violate public policy concerns. This is not a situation where a prohibition to opposing a motion to relief from stay was inserted in the original loan documents. The Debtor received significant benefits under the Third Modification and the confirmed plan treatment of Ohio National. In exchange for these benefits, the Debtor bargained away its right to oppose a motion to lift stay in a subsequent bankruptcy proceeding. Accordingly, the court will not consider the objection to relief from stay filed by the Debtor.

■ As to the third-party creditor issue, there is no question that the automatic stay is designed to protect debtors and creditors alike. A waiver by the debtor cannot bind third parties. As Judge Bishop held in *In re Cheeks, supra:*

> Enforcement of a forbearance agreement does not in itself mean that in all bankruptcy cases where one exists, the automatic stay will be lifted. These agreements do not oust this Court's Jurisdiction to hear objections to stay relief filed by other parties in interest. It simply means that this court will give no weight to a Debtor's objection as this conflicts with and is in derogation of the previous agreement.... [W]hen creditors and parties in interest entitled to notice on a motion to

lift the stay do not object, the stay becomes lifted as though the motion is in default as the "objection" of the debtor is meaningless and of no effect because of the forbearance agreement. In short, if the automatic stay remains it is not because of the debtor.

*In re Cheeks*, 167 B.R. at 819–820.

▉ In the present case there are nine third-party creditors who have objected to Ohio National's motion for relief from stay.[6] Unlike the Debtor, they have not waived their right to object to Ohio National's motion.[7] Therefore, unlike the lamentations of the Debtor, their objections carry great weight in the court's resolution of this matter.[8] The court must look at the circumstances under which the waiver arose and consider it as one of a number of factors, including the possibility of equity in the collateral and the impact of third-party creditors affected by the motion for relief from stay.

▉ As to the Debtor, Ohio National has proved sufficient "cause" to lift the stay. However, the court is not convinced that Ohio National's arguments concerning the Debtor's waiver of its right to object can overcome the legitimate objections of the other creditors in this case. Therefore, to the extent that Ohio National's motion for stay relief is based on the non-opposition clause, that motion is hereby denied.[9]

**B. Confirmability of Debtor's Plan of Reorganization**

▉ 11 U.S.C. § 1129(a)(1) provides that a court may confirm a plan only where "the plan complies with the applicable provisions of this title." Ohio National contends, among other things, that the Debtor's plan is not "feasible" as required by 11 U.S.C. § 1129(a)(11). This court agrees.

▉ Pursuant to 11 U.S.C. § 1129(a)(11), before a court may confirm a plan of reorganization, the court must find that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization ..." As articulated by one court, the key purposes served by this section are:

> (1) '[T]o prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan that [sic] the debtor can possibly attain after confirmation;' (2) to prevent an abuse of the reorganization process by the confirmation of a plan of a debtor likely to

**6.** Although the nine objecting creditors did not appear at the October 24, 1995 hearing in this matter, the parties previously stipulated that various written affidavits which those creditors had executed would be admitted into evidence and subject to consideration by this court.

**7.** It is interesting to note that of the nine objecting parties, eight were parties in the Debtor's previous Chapter 11. As such, when each of those eight parties voted to approve the Debtor's plan of reorganization in that case, each assented to the plan's treatment of Ohio National, and, more specifically, each approved the Debtor's promise to Ohio National that it would not oppose any subsequent motion for relief from stay. Likewise, because the plan was later confirmed pursuant to 11 U.S.C. § 1129(a), this court also gave its imprimatur to the agreement struck between the Debtor and Ohio National. Thus, while some courts have expressed concern that prepetition waivers should not be enforced unless the court and other third party creditors are somehow involved in making those agreements, such a concern (with the exception of one $2,600 claim) is not extant in this case.

Of course, the fact that eight of the third-party creditors acquiesced in the Debtor's agreement with Ohio National does not mean that they cannot object in their own right. It simply means that the Debtor's attempt to focus this court's attention on those creditors may be nothing more than a cry of "Wolf!"

**8.** As can be expected, the gravamen of the third-party creditors' objections is that there is substantial equity in the Atrium building which will not be realized for their benefit if the property is foreclosed upon by Ohio National. The creditors believe that their best opportunity to realize any sort of repayment on their respective debts lies in the continued management of the property by the Debtor.

**9.** Ohio National also argued that sufficient "cause" exists to warrant lifting the automatic stay because of the Debtor's inability to manage the property so as to generate sufficient income to pay the claim of Ohio National as well as other debts against the property. Because there is equity in the subject property, this court believes that the Debtor's past failings do not constitute "cause" to lift the stay, but, rather, go to the question of the feasibility of the Debtor's plan of reorganization. That issue is discussed below.

return to bankruptcy; and (3) to promote the willingness of those who deal with post-confirmation debtors to extend the credit that such companies frequently need.

*In re Agawam Creative Mktg. Assocs., Inc.,* 63 B.R. 612, 619 (Bankr.D.Mass.1986) (quoting *In re Pikes Peak Water Co.,* 779 F.2d 1456, 1460 (10th Cir.1985) and citing *In re Prudential Energy Co.,* 58 B.R. 857, 862 (Bankr.S.D.N.Y.1986)).

▮▮▮ The plan proponent has the burden of establishing by a preponderance of the evidence that the plan complies with the statutory requirements for confirmation of § 1129(a). *In re Locke Mill Partners,* 178 B.R. 697 (Bankr.M.D.N.C.1995); *In re SM 104 Ltd.,* 160 B.R. 202 (Bankr.S.D.Fla.1993); and *In re MCorp. Fin. Inc.,* 137 B.R. 219 (Bankr.S.D.Tex.1992). Accordingly, it is incumbent upon the Debtor to prove the feasibility of its plan by a preponderance of the evidence. *In re Ames,* 973 F.2d 849 (10th Cir.1992); *In re Guilford Telecasters, Inc.,* 128 B.R. 622, 627 (Bankr.M.D.N.C.1991); *Matter of Briscoe Enterprises, Ltd., II,* 994 F.2d 1160, 1165 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993). Although a debtor need not guarantee the success of its plan, it must provide "reasonable assurance" that the plan can be effectuated. *Kane v. Johns–Manville Corp.,* 843 F.2d 636, 649 (2d Cir.1988). *See also In re Orlando Investors, L.P.,* 103 B.R. 593, 600 (Bankr.E.D.Pa.1989); and *In re Kemp,* 134 B.R. 413, 416 (Bankr.E.D.Cal. 1991). Factors to be considered by a court in its calculus of the feasibility of a debtor's plan include the debtor's prior performance, the adequacy of capital structure, the earning power of the business, economic conditions, the ability of management, and any other related matter that determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *In re Briscoe Enterprises Ltd., II,* 138 B.R. 795, 805 (N.D.Tex.1992) rev'd 994 F.2d 1160, 1165 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993) (citing *Canal Place Ltd. Partnership v. Aetna Life Ins. Co. (In re Canal Place Ltd. Partnership),* 921 F.2d 569, 579 (5th Cir.1991)).

In the instant case, Ohio National argues that the Debtor's plan is but a visionary scheme because the Debtor has not been able to meet its operating expenses and mortgage payments in the past and its expectations for future performance are unfounded. For example, in 1992, the Debtor defaulted on its loan to Ohio National by failing to pay its 1991 ad valorem taxes. This happened at a time when the Debtor enjoyed a ninety-seven percent occupancy rate. Similarly, notwithstanding a one hundred percent occupancy rate in 1994, the debtor failed to pay its 1994 ad valorem taxes when they became due in January, 1995. On top of these defaults lie the various modifications that Ohio National executed because of the reduction in cash flow caused by the broken leases of a few of the Debtor's larger tenants. In total, the Debtor's inability to meet its financial obligations has forced Ohio National to weather four defaults, three loan modifications and two Chapter 11 proceedings in less than five years.

As for the future, the Debtor projects a one hundred percent occupancy rate by the end of 1996. Even if the Debtor is successful in attaining that rate, the Debtor's past record demonstrates that it will have great difficulty meeting its obligations as they become due.

A one hundred percent occupancy rate will be difficult to attain, however. A close examination of the Debtor's existing leases reveals that one lease covering 9,258 square feet (approximately sixteen percent of the Atrium's rentable space) is set to expire in December 1995. Three other leases have already expired and are on a month-to-month basis. One lease is with an entity that is in itself operating in a Chapter 11 proceeding, and the debtor in that case, has not, as yet, assumed or rejected that lease. And finally, five other leases, covering a total of 15,232 square feet, will expire before the end of 1996. Couple all this with a present vacancy rate of twenty percent, and this court cannot say that it is more likely than not that the Debtor will attain a one hundred percent occupancy rate and be able to meet its pres-

ent obligations, as is projected in its plan of reorganization.[10]

Lastly, we come to the plan's proposed treatment of Ohio National. Under the plan all monies owed to Ohio National on December 31, 1998, will balloon and become payable in full on that date. The Debtor estimates that amount will be approximately $4,236,-541.65. Because virtually all of the income generated from the Atrium project will be required to fund the plan and to keep the Debtor operating, the Debtor proposes to pay off Ohio National in December 1998 by either selling the property or by refinancing. However, the Debtor has not demonstrated by a preponderance of the evidence that sufficient financing will be available at that time. To the contrary, the Debtor's appraiser testified that it is generally the standard in the industry for banks to loan no more than seventy-five to eighty percent of the value of property securing a loan. Accordingly, even if the property is worth $5,000,000 as was testified to by the appraiser, the most that a bank would be willing to loan against the property is $4,000,000. It is, therefore, highly speculative that the Debtor will, in fact, be able to find another bank that would be willing to refinance this debt.[11] It is equally speculative that the Debtor will find a buyer to purchase the property before December 31, 1998.

In light of the above, this court is unable to conclude that the Debtor's plan of reorganization is "feasible" under the Bankruptcy Code. This court cannot find or conclude that confirmation of the plan is "not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor ..." as is required by § 1129(a)(11) of the Code.

 Inasmuch as confirmation will be denied due to the failure to comply with

§ 1129(a)(11), this court will not address the issue of whether the plan has been proposed in good faith. Similarly, the issue requesting cram down will not be discussed as the issue is moot. Pursuant to § 1129(a)(1), a debtor may request cram down if *all* the provisions but § 1129(a)(8) are met and the plan does not discriminate unfairly and is fair and equitable with respect to any class that is impaired and did not accept the plan. Inasmuch as the plan fails to comply with the applicable provisions of § 1129(a), cram down is not available to the Debtor.

Any finding of fact that should more appropriately be denominated as a conclusion of law is incorporated herein by reference.

## CONCLUSIONS OF LAW

This court finds there is not sufficient "cause" under 11 U.S.C. § 362(d)(1) to warrant lifting the automatic stay at this time. Accordingly, Ohio National's motion requesting such relief is hereby denied. Additionally, the court finds that the Debtor's proposed plan of reorganization is not feasible as is required by 11 U.S.C. § 1129(a)(11). Therefore, the Debtor's Motion to Confirm and Cram Down its First Amended Plan of Reorganization is also denied.

---

**10.** The Debtor did offer testimony that there are certain tenants who wish to expand and renew their leases. However, no written leases supporting this contention were introduced into evidence or presented to the court for review.

**11.** The appraiser did testify that the property was likely to increase in value over the next few years. However, the court also notes that the appraiser's valuation of the property at $5,000,-000 may have been somewhat inflated. As stated

above, the witness' appraisal was based on a formula utilizing values that reflected a total rentable area of 60,000 square feet and an occupancy rate of 90%. When asked to assume a total rentable area of 56,000 at an 80% occupancy rate (figures more in line with the reality of the Debtor's situation), the appraiser stated that the fair market value of the Atrium building could be somewhere near $3,450,000.