### In re TRANS WORLD AIRLINES, INC., et al., Debtors.

### No. 01–0056 (PJW).

United States Bankruptcy Court,
D. Delaware.

March 12, 2001.

Laura Davis Jones, Bruce Grohsgal, Pachulski, Stang, Ziehl, Young & Jones P.C., Wilmington, DE, James H.M. Sprayregen, Marc Kieselstein, David R. Seligman, Kristin E. Rooney, Alexander Dimitrief, Kirkland & Ellis, Chicago, IL, Co–Counsel for the Debtors and Debtors in Possession.

Michael D. DeBaecke, Deborah Cirilla Sellis, Blank Rome Comisky & McCauley LLP, Wilmington, DE, Thomas E. Biron, Blank Rome Comisky & McCauley LLP, Philadelphia, PA, Michael Z. Brownstein, Blank Rome Tenzer, Greenblatt LLP, New York City, Counsel for the Official Committee of Unsecured Creditors of Trans World Airlines, Inc.

Joanne B. Wills, Steven K. Kortanek, Klehr, Harrison, Branzburg & Ellers LLP, Wilmington, DE, Edward S. Weisfelner, Andrew Dash, John P. Biedermann, Berlack, Israels & Liberman, New York City, Counsel to the High River Entities.

## MEMORANDUM OPINION

PETER J. WALSH, Chief Judge.

Before the Court is the motion (Doc. # 255) by the debtor, Trans World Airlines, Inc. ("TWA" or "Debtor") to reject its ticket program agreement ("Ticket Agreement") with Karabu Corp. ("Karabu"). The Official Committee of Unsecured Creditors filed a joinder. (Doc. # 434). Karabu and related entities filed an objection (Doc. # 491) to which TWA filed a reply (Doc. # 595). I held an evidentiary hearing on March 10, 2001 and heard oral argument on March 12, 2001.[1] The central issue is the enforceability of a prepetition waiver of the Debtor's right to reject the contract under § 365.[2] For the reasons discussed below, I will grant the Debtor's motion.

## FACTS

The facts are essentially not in dispute. This is TWA's third chapter 11 filing in

---

1. This Opinion constitutes this Court's findings of fact and conclusions of law under Fed.R.Bank.P. 7052 as made applicable to contested matters in bankruptcy by Fed.R.Bank.P. 9014.

2. Unless otherwise indicated, all references to " § ___" are to a section of the Bankruptcy Code, 11 U.S.C. § 101 et. seq.

less than 10 years. The Ticket Agreement arises from TWA's second bankruptcy in 1995. The agreement is the result of TWA's restructuring of financial arrangements it had entered into with Karabu, Carl Icahn ("Icahn"), Icahn affiliates, and the Pension Benefit Guarantee Corporation ("PBGC") during its first bankruptcy.

TWA filed its first chapter 11 case in January 1992 ("TWA I"). TWA Motion at p. 2, ¶ 2; Karabu Opp. at p. 4, ¶ 7. On January 5, 1993, before emerging from the first bankruptcy, TWA entered into a settlement agreement to resolve a pension funding claim by the Pension Benefit Guarantee Corporation ("PBGC"). TWA Motion at p. 2, ¶ 2; Karabu Opp. at p. 4, ¶ 7.

Pursuant to the settlement TWA issued three promissory notes in the aggregate principal amount of $300 million (the "Old PBGC Notes") to a Settlement Trust established pursuant to its confirmed plan. TWA Motion at p. 3, ¶ 3. An Icahn affiliate assumed TWA's former pension plans. *Id.* In addition, TWA obtained approximately $200 million in exit financing from Karabu and related entities (the "Karabu Loans"). TWA Motion at p. 2, ¶ 2; Karabu Opp. at p. 4, ¶ 7. Karabu, in turn, pledged the $200 million TWA notes to the PBGC as security for Karabu's assumption of TWA's former pension plans. Karabu Opp. at 4, ¶ 7.

TWA was unable to repay the Karabu Loans when they matured on January 8, 1995. TWA Motion at p. 3, ¶ 4; Karabu Opp. at p. 4, ¶ 8. Consequently, on June 14, 1995, TWA entered into an Extension, Refinancing and Consent Agreement ("Extension Agreement") with Karabu, Icahn and the Icahn related entities. TWA Motion at p. 3, ¶ 4; Karabu Opp. at p. 4, ¶ 9. The Extension Agreement extended the maturity of the Karabu Loans through January 8, 2001. In addition, the Exten-

sion Agreement allowed TWA to exchange the Old PBGC Notes for new PBGC notes ("New PBGC Notes") in the aggregate principal amount of approximately $249 million and equity. TWA Motion at p. 3, ¶ 4; Karabu Opp. at p. 4, ¶ 9. The Extension Agreement required TWA to enter into the Ticket Agreement with Karabu. TWA Motion at p. 3, ¶ 5; Karabu Opp. at p. 2, ¶ 2 and Exh. A at p. 6, § 6. TWA did so on June 14, 1995.

The parties entered into the Extension Agreement and Ticket Agreement in contemplation of TWA filing a prepackaged chapter 11 petition. Accordingly, in July 1995 TWA filed its second chapter 11 petition ("TWA II") in the United States District Court for the District of Missouri ("Missouri Court"). On August 23, 1995, the Missouri Court entered a confirmation order ("1995 Confirmation Order"). According to Karabu, the Extension Agreement and the Ticket Agreement were an integral component of this "prepackaged" chapter 11 filing. Karabu Opp. at pp. 1–2, ¶¶ 1–2.

The Ticket Agreement has a term of 99 months and is set to expire on September 30, 2003. TWA Motion at p. 6, ¶ 13. It permits Karabu to purchase, for sale to end users, TWA tickets at substantially discounted rates. Specifically, the Ticket Agreement allows Karabu to purchase "Domestic Consolidator Tickets" at rates which are 40% off published fares for the lower price domestic fare in effect on certain dates. TWA Motion at 4, ¶ 8. It also allows Karabu to purchase "System Tickets" at 45% off all published fares net of applicable taxes, fees, passenger facility charges and other charges. *Id.* Presently, Karabu sells these tickets through Lowestfare.com, also an Icahn entity.

According to TWA, "[w]hile the Domestic Consolidator Fares generally include tickets only in TWA's lower price 'buckets'

of available fares, System Tickets extend to all 'buckets' of fares offered by TWA, including first-class and full price coach tickets. This feature of the Ticket Agreement gives Karabu unlimited access to all of TWA's classes of tickets...." *Id.* There is no cap on TWA's obligation to sell System Tickets. Karabu "may purchase, and TWA is obligated to sell, as many System Tickets as Karabu wishes to buy, subject only to the availability of seat inventory at the time of purchase." *Id.* at p. 5, ¶ 9. TWA's obligation to sell Domestic Consolidator Tickets is capped at $ 70 million dollars per year. *Id.*

The Ticket Agreement gave Karabu the option to retain the price it paid for purchased tickets as a credit against TWA's outstanding balance on the Karabu Loans or as prepayment of the New PBGC Notes. TWA's Motion at 5, ¶ 11. By December 30, 1997, TWA prepaid the outstanding balance of the Karabu Loans in full from the proceeds of a receivable securitization. *Id.* By the end of 1998, the New PBGC Notes were also paid in full. Since then, TWA has received the proceeds of ticket sales from Karabu. *Id.*

The Ticket Agreement contains the following bankruptcy related provisions ("Waiver Provisions"):

15. Bankruptcy

(a) If a Bankruptcy Event (which shall include, for this purpose, the filing by TWA of a petition for relief under Chapter 11 as described in the proviso of the definition of Bankruptcy Event) occurs, TWA agrees not to seek to reject this Agreement, pursuant to section 365(a) of the Bankruptcy Code, as an executory contract, or to support any motion made by a third party seeking to force a rejection of this Agreement as an executory contract or for any other reason...

(b) TWA acknowledges and agrees that credits against the Karabu Loans and payments made in respect of the PBGC Loans ... shall be deemed to be made in the ordinary course of the businesses of the respective parties hereto, and, if a Bankruptcy Event occurs, TWA shall not seek (or support any attempt by any third party to seek), pursuant to sections 547(b), 550(a) of the Bankruptcy Code, to avoid and recover either the amounts of such credits or the funds retained by Karabu from Ticket sales which result in such credits as preferential transfers ...

(c) If a Bankruptcy Event (which shall include, for this purpose, the filing by TWA of a petition for relief under Chapter 11 described in the proviso of the definition of Bankruptcy Event) occurs, TWA agrees, at the request of Karabu, to use its best efforts to obtain as soon as practicable an order of the bankruptcy court approving the assumption of this Agreement under Section 365 of the Bankruptcy Code and, if a motion is made seeking the rejection of this Agreement, TWA shall at Karabu request either take all appropriate action to object to and oppose such motion or make and diligently pursue a cross-motion seeking an order of the bankruptcy court approving the assumption of this Agreement under Section 365 of the Bankruptcy Code.

TWA filed its third chapter 11 petition on January 10, 2001 ("TWA III"). On January 12, 2001 Karabu sent TWA a letter requesting assumption of the Ticket Agreement. The letter provides in pertinent part:

[P]ursuant to Section 15(c) of the Agreement, Karabu is requesting that TWA obtain, as soon as practicable, an order of the court having jurisdiction over TWA's Chapter 11 bankruptcy proceeding which has just been initiated, approving the assumption of the Agree-

ment by TWA, as debtor-in-possession, under Section 365 of the Bankruptcy Code. In addition, if a motion is made seeking the rejection of the Agreement, you are requested to either take all appropriate action to object to and oppose such motion or make and diligently pursue a cross-motion seeking an order of the court approving the assumption of the Agreement under Section 365 of the Bankruptcy Code.

Your attention is directed to Section 15(a) of the Agreement setting forth TWA's agreement not to seek to reject the Agreement and not to support the motion of a third party seeking to force a rejection of the Agreement.

Karabu Opp., Exh. C.

On January 26, 2001 TWA filed the present motion for authority to reject the Ticket Agreement pursuant to § 365 which provides in relevant part:

(a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(a).

At the hearing on March 10, 2001, TWA put on two witnesses in support of its motion to reject the Ticket Agreement: John J. Stelzer ("Stelzer") the Senior Vice President of Planning at TWA, and Captain William F. Compton ("Compton"), TWA's Chief Executive Officer.

Based on the essentially uncontested testimony I find that the existence of the Ticket Agreement is a material burden for TWA. Specifically, Stelzer's testimony established that the Ticket Agreement adversely impacts TWA in three areas. First, the existence of the Ticket Agreement has a significant negative revenue impact on TWA. Second, the Ticket

Agreement renders TWA's yield management process ineffective. Third, the Ticket Agreement has resulted in lost business opportunities for TWA, primarily in the area of online ticket sales programs. Compton's testimony further establishes that the Ticket Agreement was a significant impediment to TWA's ability to enter a strategic transaction with another airline and contributed to TWA's inability to effectuate a non-bankruptcy resolution of its financial challenges.

Stelzer testified that Karabu's ability to sell System Tickets at 55% of the retail fare has an adverse effect on TWA's ability to generate revenue and results in a significant negative revenue impact. In the year 2000, for example, Stelzer estimated the negative revenue impact for TWA was $90.8 million. Although this amount may be subject to reduction as a function of expenses related to generating ticket sales not included in Stelzer's calculations, I conclude that a net figure including expenses would still result in a material negative revenue impact.

Stelzer also testified that the existence of the Ticket Agreement renders TWA's yield management process ineffective. Like other airlines, TWA relies on a computer system that estimates future demand for tickets based on a statistical analysis of the company's historical performance. To function accurately, the system requires historical consistency and predictability. Stelzer testified that Karabu's sales of TWA tickets under the Ticket Agreement have been neither stable or consistent and that this instability undermines the accuracy of the system's projections.

More importantly, however, Stelzer testified that the yield management system does not and is unable to account for the discount Karabu enjoys under the Ticket Agreement because the system generates

projections based on the retail fare value of tickets rather than on the revenue actually generated to TWA. In other words, when Karabu sells a ticket under the Ticket Agreement for which TWA receives 55% of the retail fare, the yield management system bases its projections for TWA on the full fare value of the ticket rather than on the 55% amount that TWA actually receives. This problem exists throughout the system and Stelzer testified that he knows no other system that can adjust for an arrangement like the Ticket Agreement.

I find that the Ticket Agreement has a substantial adverse effect on TWA's yield management system. This is a forecasting tool and because Karabu demand under the Ticket Agreement is unpredictable, it makes the tool ineffective. Furthermore, TWA's yield management system cannot accommodate the Ticket Agreement because it records tickets at full fare price rather than at the Karabu price, i.e., TWA's actual revenue generated from the ticket sales. This renders the entire system ineffective.

Finally, Stelzer testified that TWA lost business opportunities because of the Ticket Agreement, primarily in the area of internet ticket sales. According to Stelzer, internet ticket sales have increased significantly in the industry in recent years and internet sales typically include special discounts to make online sales attractive to consumers. Stelzer testified that the Ticket Agreement impedes TWA's efforts to develop online sales because Karabu has the ability to sell TWA's internet discounted tickets at the additional discount available under the Ticket Agreement. Consequently, the profitability of offering discounts, and TWA's ability to do so, is eroded by the Ticket Agreement. Stelzer testified this has resulted in lost business opportunities for TWA not only

with its own website, but also in connection with TWA's ability to work with independent internet companies that are in the business of selling tickets online. Stelzer also stated that the Ticket Agreement's effect on TWA's own discount initiatives caused lost business opportunities in areas beyond internet sales. The testimony in this regard was undisputed and I find that Karabu's ability to sell already discounted TWA tickets at the additional discount available under the Ticket Agreement has resulted in lost business opportunities for TWA.

TWA's Chief Executive Officer testified that the existence of the Ticket Agreement was a significant impediment to TWA's ability to enter a strategic transaction with another airline. Compton's unrefuted testimony is that the Ticket Agreement was an obstacle to all discussions with other airlines about a possible strategic transaction. I note that although the Ticket Agreement may not have precluded TWA's ability to enter into a code-sharing or similar arrangement with other airlines, the testimony is overwhelming that TWA's viability depended on a strategic transaction, i.e., a merger with or sale to another airline. The existence of the Ticket Agreement therefore undermined TWA's ability to pursue the type of transaction which the evidence clearly establishes was TWA's only alternative to liquidation. Compton's persuasive and credible testimony is further supported by the fact that under the strategic transaction with AMR Corporation ("American"), the Ticket Agreement is not an acceptable obligation to assume.

In response to TWA's motion, Karabu gives four reasons why rejection should not be approved by the Court. First, Karabu argues TWA is judicially estopped from seeking rejection because the Ticket Agreement contains an express waiver of TWA's right to reject the agreement pur-

suant to § 365 and the agreement itself is part of TWA's prior confirmed chapter 11 plan. Second, Karabu argues the prior confirmation order is *res judicata* as to TWA's ability to reject. Third, Karabu alleges that TWA's decision to reject should meet the "strict scrutiny" standard rather than the "business judgment" standard based on TWA insiders' alleged financial interest in rejecting the Ticket Agreement to enable the proposed sale of substantially all of TWA's assets to American. Finally, Karabu argues the court must consider the devastating effect of rejection on the non-debtor party to the Ticket Agreement.

## DISCUSSION

### I. JUDICIAL ESTOPPEL.

Judicial estoppel seeks to prevent a litigant from asserting a position inconsistent with one the litigant previously asserted in the same or prior proceeding. *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.,* 81 F.3d 355, 358 (3d Cir.1996). This judge-made doctrine does not intend to eliminate all inconsistencies, however slight or inadvertent. *Id.* Rather, the doctrine is "designed to prevent litigants from playing 'fast and loose' with the courts." *Id.* (citations omitted).

Judicial estoppel protects the integrity of the courts. *Ryan Operations,* 81 F.3d at 360. The doctrine prevents a party from asserting mutually exclusive positions because the "integrity of the court is affronted by the inconsistency notwithstanding the lack of identity of those against whom it is asserted." *Id.* Thus, for example, the Court of Appeals for the Third Circuit applied judicial estoppel to a plaintiff who sought damages from his employer for complete incapacitation following a work-related injury, and then proceeded to sue the employer for

reinstatement under a collective bargaining agreement after winning the damages award. *Ryan Operations,* 81 F.3d at 359 *discussing Scarano v. Central R. Co. of New Jersey,* 203 F.2d 510 (3d Cir.1953).

Application of judicial estoppel in the Third Circuit requires a showing of intentional wrongdoing. *Ryan Operations,* 81 F.3d at 362. Asserting an inconsistent position alone does not trigger its application. *Id.* Rather, the self-contradiction must be used as a means of obtaining an unfair advantage. *Id.* "An inconsistent argument sufficient to invoke judicial estoppel must be attributable to intentional wrongdoing." *Id.* (doctrine does not apply when prior position was taken due to good faith mistake rather than as scheme to mislead court).

Accordingly, under *Ryan Operations,* whether a litigant asserts inconsistent positions within the meaning of the judicial estoppel doctrine entails a two part inquiry. *Ryan Operations,* 81 F.3d at 361. Is the party's present position inconsistent with a position it asserted in its prior judicial proceeding? *Id.* If so, did the party assert either or both of the inconsistent positions in bad faith—i.e., with intent to play fast and loose with the court? *Id.* Judicial estoppel is an appropriate remedy only if both prongs are satisfied. *Ryan Operations,* 81 F.3d at 361, 364 (judicial estoppel is an "extraordinary remed[y] to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice") *quoting Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 424 (3d Cir.1988)(Stapleton, J., dissenting).

Applying this standard to the present controversy, I find judicial estoppel does not apply. Assuming without deciding that TWA's motion to reject the Ticket Agreement in TWA III is inconsistent with

its agreement not to do so in a contract entered into as part of TWA II, Karabu fails to allege that TWA asserted either or both of its positions in bad faith.[3] Nor does Karabu allege that TWA unfairly induced Karabu to enter into the Ticket Agreement. The record is devoid of any evidence that TWA acted in bad faith. Indeed, apart from the pending rejection motion, it appears TWA otherwise fully honored the contract since emerging from TWA II in 1995.

The gist of Karabu's judicial estoppel argument is that the Ticket Agreement was an integral component of TWA's confirmed chapter 11 plan in TWA II on which both Karabu and the Missouri Court relied. The evidence does not support Karabu's assertion that the Missouri Court judge relied on the Ticket Agreement. Even if the 1995 Confirmation Order references the Extension Agreement, as Karabu alleges, this only suggests that the Missouri Court considered the Extension Agreement part of the 1995 reorganization plan. It does not establish that the court relied on the ancillary Ticket Agreement as a basis for confirming the plan.

Karabu makes a number of statements in its Objection claiming that the Missouri Court in its confirmation order specifically approved the Ticket Agreement with its Waiver Provisions. For example, Karabu asserts:

"[T]he Karabu Contract, as a requirement of the Extension Agreement, was a key element of TWA's 1995 reorganization and was relied upon by the Missouri Bankruptcy Court in confirming TWA's plan of reorganization in that case." Karabu Opp. at p. 12, ¶ 24.

\* \* \*

"[T]he Karabu Contract was not only an integral part of the consensual resolution of TWA's prior bankruptcy proceeding, but also was relied on by the Missouri Bankruptcy Court in its 1995 Confirmation Order as a part of the Extension Agreement in confirming the plan of reorganization therein entered by the Bankruptcy Court in that proceeding." Karabu Opp. at p. 14, ¶ 28.

As far as I can determine, the only reference cited by Karabu for these claims is page 42 of the 1995 Confirmation Order. The pertinent portion of page 42 of the 1995 Confirmation Order reads as follows:

"Based on the testimony of Mr. Polombo, the Court finds that pursuant to the terms of the Extension, Refinancing and Consent Agreement, dated June 14, 1995 by and between TWA and Karabu Corp., the final majority of the Icahn

---

**3.** The cases Karabu proffers in support of its position are not persuasive. Several are from other circuits with a different standard for judicial estoppel. *E.g., Reynolds v. Comm'r of Internal Revenue,* 861 F.2d 469 (6th Cir.1988); *Edwards v. Aetna Life Ins., Co.,* 690 F.2d 595 (6th Cir.1982); *Galerie Des Monnaies of Geneva v. Deutsche Bank, A.G. (In re Galerie Des Monnaies of Geneva),* 62 B.R. 224 (S.D.N.Y. 1986). The Third Circuit cases Karabu does cite, *E.F. Operating Corp. v. American Bldgs.,* 993 F.2d 1046 (3d Cir.1993), *Delgrosso v. Spang & Co.,* 903 F.2d 234 (3d Cir.1990) and *Oneida Motor Freight,* 848 F.2d 414 (3d Cir. 1988), predate *Ryan Operations* and therefore no longer accurately represent the Third Circuit standard for judicial estoppel. In fact, *Ryan Operations* limits the scope of *Oneida Motor Freight,* Karabu's most relevant case, which had held that judicial estoppel precluded a chapter 11 debtor from pursuing a preference action post-confirmation against its former lender where the debtor had failed to disclose the suit in its disclosure statement. *Oneida Motor Freight,* 848 F.2d at 420. *Ryan Operations* discussed *Oneida Motor Freight* at length and expressly rejected a rule that the requisite bad faith or intent for judicial estoppel can be inferred from the mere fact of nondisclosure in a bankruptcy proceeding. *Ryan Operations,* 81 F.3d at 364.

Financing Facilities has been extended through and including January 8, 2001. Accordingly, the condition to confirmation that the final maturity of the Icahn Financing Facilities be extended to a date not earlier than January 8, 2000 has been met."

I find Karabu's claims as to the Ticket Agreement being a key element of the 1995 reorganization and the Missouri Court's reliance thereon in confirming the plan to be quite misleading.

Absent specific findings regarding the terms and conditions of a particular contract, it is a mischaracterization of the confirmation process to suggest that the 1995 Confirmation Order establishes reliance on the Ticket Agreement by the Missouri Court. Furthermore, as indicated above, even if the Missouri Court did consider the Ticket Agreement as an integral component of the 1995 Confirmation Order, there simply is no evidence that TWA acted in bad faith or played "fast and loose" with that Court.

■ Karabu also has made no effort to show that TWA's contractual agreement not to reject the Ticket Agreement in a subsequent bankruptcy case constitutes an "inconsistent statement" for purposes of judicial estoppel. I note that TWA's representations in § 15 of the Ticket Agreement are to Karabu, not to the Court. Accordingly, TWA's attempt to reject the Ticket Agreement in this proceeding is not an affront to the integrity of the *judicial* process, although it may be a breach of its contract with Karabu. A careful distinction must be drawn between enforcing a document which is contractually binding between two parties and applying the preclusive effect of judicial estoppel to a litigant's actions vis-à-vis the court. Karabu's argument leads to the untenable conclusion that judicial approval of a contract is a representation by the parties *to*

*the court* not to breach the contract in the future. There is no merit to this position.

I also disagree that the doctrine of judicial estoppel otherwise renders the Waiver Provisions enforceable. It seems to me that Karabu is attempting to use judicial estoppel to transform a prepetition contractual waiver of a bankruptcy right into an unassailable court order. I am not persuaded by the effort. As discussed previously, Karabu fails to establish any of the elements required for judicial estoppel to apply. Of greatest significance, there simply is no evidence that the Missouri Court specifically sanctioned the Waiver Provisions, or that it was even aware of its existence in the Ticket Agreement. There is no evidence that the Waiver Provisions were an issue addressed by the Missouri Court, let alone the subject of a contested matter or that they were the product of a contested matter, i.e., a stipulation resolving a contested matter.

■ In the absence of any evidence that the court in TWA II specifically sanctioned the Waiver Provisions, I see no reason to treat the provisions differently than those contained in any other prepetition contract. The real issue, therefore, is whether I should enforce a prepetition contractual waiver of the Debtor's rights under § 365(a). For the reasons discussed below, I hold that the Debtor cannot unilaterally contract away its authority to assume or reject an executory contract.

Numerous courts have addressed whether a prepetition agreement to waive a benefit of bankruptcy is enforceable. *See Hayhoe v. Cole (In re Cole)*, 226 B.R. 647, 651–52 (9th Cir. BAP 1998)(collecting cases). It has long been true that contractual provisions prohibiting the filing of a bankruptcy case are not enforceable. *E.g.*, *In re Shady Grove Tech. Ctr. Assocs. Ltd. P'ship*, 216 B.R. 386, 390 (Bankr.D.Md.

1998); *Fallick v. Kehr*, 369 F.2d 899, 904 (2d Cir.1966). Courts have also held that a prepetition waiver of the bankruptcy discharge is unenforceable. *In re Cole*, 226 B.R. at 651. However, there are some cases, particularly in the single asset real estate context, which enforce contractual waivers of the automatic stay. *In re Pease*, 195 B.R. 431, 432–33 (Bankr.D.Neb. 1996) (collecting cases).

Karabu relies on this emerging trend under § 362 for its argument that I should enforce TWA's prepetition waiver of its authority to reject the Ticket Agreement under § 365. I decline to do so for the following reasons.

A debtor's authority to assume or reject an executory contract "is vital to the basic purpose [of] a Chapter 11 reorganization, because rejection can release the *debtor's estate* from burdensome obligations that can impede a successful reorganization." *N.L.R.B. v. Bildisco*, 465 U.S. 513, 528, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (emphasis added). It seems to me that a debtor's prepetition agreement not to reject an executory contract, or conversely, to assume such a contract, violates public policy in that it purports to bind the debtor-in-possession to a course of action without regard to the impact on the bankruptcy estate, other parties with a legitimate interest in the process or the debtor-in-possession's fiduciary duty to the estate.

The cases that bind a debtor to a prepetition waiver of objection to a lift stay motion are not persuasive because they all recognize the right of other creditors to object to the lift stay motion. *E.g., In re Atrium High Point Ltd. P'ship*, 189 B.R. 599, 607 (Bankr.M.D.N.C.1995)(section 362 waiver by debtor cannot bind third parties); *In re Cheeks*, 167 B.R. 817, 819 (Bankr.D.S.C.1994)(debtor's forbearance agreement does not prevent court from hearing objections to stay relief filed by other parties in interest); *In re Powers*, 170 B.R. 480, 483 (Bankr.D.Mass.1994)("A waiver by the debtor cannot bind third parties"); *In re Club Tower, L.P.*, 138 B.R. 307, 311 (Bankr.N.D.Ga.1991)(enforcing debtor's prepetition waiver but implicitly recognizing third party rights in noting that debtor still retains benefits of automatic stay as to other creditors as well as other benefits and protections provided by Bankruptcy Code); *In re Citadel Prop., Inc.*, 86 B.R. 275, 276–77 (Bankr.M.D.Fla.1988)(enforcing prepetition waiver agreement only where evidence indicated debtor had no realistic chance to reorganize and sufficient cause existed to lift stay because petition was filed in bad faith). Thus, as a practical matter those cases do not stand for the proposition that a significant bankruptcy law provision can be waived prepetition at the expense of the general creditor body of the estate.

I also do not believe TWA has the capacity to waive its authority under § 365 on behalf of the debtor-in-possession in disregard to the rights of third parties not bound by the prepetition agreement. In this regard, I find the analysis of *In re Pease* persuasive.

[B]efore the bankruptcy case is filed, the debtor does not have the capacity to waive the rights bestowed by the Bankruptcy Code upon a Chapter 11 debtor in possession.

Prior to the commencement of the bankruptcy case, the debtor entity has the capacity to enter into an agreement binding upon the debtor under applicable non-bankruptcy law. Upon the commencement of a Chapter 11 bankruptcy case, the debtor becomes a "debtor in possession" with a fiduciary duty to creditors and rights and obligations under federal law. *See* §§ 1101, 1107. Those rights include the enforcement of

the automatic stay, which protects the debtor in possession and property of the bankruptcy estate. *See* § 362(a). In this sense, the Chapter 11 debtor is a separate and distinct entity from the pre-bankruptcy debtor. Before the bankruptcy case is filed, the debtor does not hold the rights of a debtor in possession and does not hold fiduciary duties to creditors. The debtor certainly has capacity to enter into agreements which define the rights and obligations of the debtor under applicable non-bankruptcy law, and those agreements are generally given force and effect in bankruptcy cases. However, I conclude that the pre-bankruptcy debtor simply does not have the capacity to waive rights bestowed by the Bankruptcy Code upon a debtor in possession, particularly where those rights are as fundamental as the automatic stay.

*In re Pease,* 195 B.R. at 433.

I conclude that the same reasoning applies to an attempted waiver of the debtor's rights under § 365. As stated by the Supreme Court, the debtor's authority to reject an executory contract is "vital to the basic purpose [of] a Chapter 11 reorganization." *Bildisco,* 465 U.S. at 528, 104 S.Ct. at 1197. Therefore the rights under § 365 are as fundamental as those under § 362.

I hold that a debtor may not agree to assume or reject an executory contract until after the bankruptcy case is commenced and the debtor is acting in the capacity of debtor-in-possession. Even then, the Bankruptcy Code prevents the debtor-in-possession from making a unilateral decision to assume or reject a contract. Section 365(a) requires court approval of the decision and § 1109 states that a "party in interest, including . . . a creditors' committee, an equity security holders' committee, a creditor, an equity

security holder, or any indenture trustee, may raise and may appear and be heard on *any issue* in a case under [chapter 11]." 11 U.S.C. § 1109 (emphasis added).

There is a further practical result in this case that prevents enforcement of the Waiver Provisions. If TWA were not to be sold as a going concern and the case were converted to one under chapter 7, it could not be seriously challenged that a chapter 7 trustee could not move to reject the Karabu contract because the trustee certainly (given the nature of TWA's business) could not assume that contract. Why should the purpose and effect of § 365 be different in a chapter 11 debtor-in-possession case? Indeed, to bind the TWA estate to the waiver provision in the chapter 11 case could have the effect of promoting a conversion of the case to chapter 7. Karabu would then suffer the same result, i.e., rejection of the Ticket Agreement, but there would also be a significant and unnecessary loss to creditor constituencies.

Karabu relies primarily on *In re Atrium High Point Ltd. P'ship,* 189 B.R. 599 (Bankr.M.D.N.C.1995) for its position. For a number of reasons, I find this case factually and legally distinguishable.

In *Atrium,* the debtor was a partnership formed for the purpose of managing a two-story office building, its sole asset. 189 B.R. at 602. The debtor had chronic difficulties servicing its mortgage on the building. *Id.* It entered into several agreements with its lender to modify the terms of the loan but was unable to avoid bankruptcy. *Id.* at 602–03. As part of the plan in its first chapter 11 case, the debtor and lender entered into yet another modification of the mortgage note. *Id.* The modification and the debtor's chapter 11 plan, approved by the court and assented to by all the debtor's prepetition creditors, contained language prohibiting the debtor

from objecting to any motion to lift stay in any subsequent bankruptcy proceeding. *Id.* at 603.

The debtor was unable to survive. A little under two years later, it filed a second chapter 11 petition. *Atrium*, 189 B.R. at 603. The lender, acknowledging that the debtor probably had some equity in the office building, sought relief from stay under § 362(d)(1). *Id.* at 605. The lender argued that there was "cause" to lift the stay because of the prepetition agreement and prior plan treatment wherein the debtor agreed it would not oppose any lift stay motion by the lender. *Id.* The debtor and other creditors objected.

The court, after reviewing arguments for and against the enforceability of bargained-for prepetition waivers of the automatic stay, concluded that such waivers are enforceable in appropriate cases. *Atrium*, 189 B.R. at 607. The court reasoned that

> [a]lthough an order of this court granting relief from stay may debilitate the Debtor somewhat, the Debtor accepted that risk when it agreed to the prepetition waiver of the automatic stay. There was no prepetition waiver in the original loan agreement or under the First or Second Modification. The agreement not to object to the motion to lift stay was bargained for under the Third Modification and under this Debtor's first confirmed plan of reorganization. . . .
>
> Enforcing the Debtor's agreement under these conditions does not violate public policy concerns. This is not a situation where a prohibition to opposing a motion to relief from stay was inserted in the original loan documents. The Debtor received significant benefits under the Third Modification and the confirmed plan treatment of [the lender]. In exchange for these benefits, the Debtor

bargained away its right to oppose a motion to lift stay in a subsequent bankruptcy proceeding. Accordingly, the court will not consider the objection to relief from stay filed by the Debtor. *Atrium*, 189 B.R. at 607.

Karabu relies on this outcome for its argument that the Waiver Provisions should be enforced. It argues that the facts here are like those in *Atrium* and that as "part of the bargain by which Karabu agreed to extend [the Karabu Loans], TWA agreed to enter into the [Ticket Agreement] and to waive any effort in a subsequent Chapter 11 case to seek its rejection." Karabu Opp. at 11–12, ¶ 23. Karabu asserts that TWA is therefor judicially estopped from seeking to evade its obligations in TWA III after having accepted the benefits of the Ticket Agreement for purposes of TWA II. *Id.*

I note at the outset that the *Atrium* case did not involve judicial estoppel. In fact, as I read the *Atrium* opinion, it is clear to me that the ruling does *not* turn on the fact that the debtor's stay waiver was a part of the plan and approved by the bankruptcy court in the prior chapter 11 case. The case simply does not stand for the proposition that a debtor is judicially estopped from challenging a contractual agreement entered into, even as part and parcel of a confirmed plan, in a prior bankruptcy case.

I also find the *Atrium* case factually distinguishable. *Atrium* is a single asset real estate case and the argument in favor of enforcing a prepetition waiver of the automatic stay is strongest in these cases. The court recognized that a waiver of the automatic stay in single-asset cases with a debtor waiving its right against the lender is the most likely to be enforced. *See Atrium*, 189 B.R. at 605–06 (courts holding such waivers are valid espouse the view that enforcement furthers the legitimate

public policy of encouraging out-of-court restructuring and settlements).[4]

Even so, as the *Atrium* court discussed, there is strong authority for *not* enforcing such waivers in single asset cases.

> A prepetition waiver of the automatic stay may be simply a tailored form of relief, but its impact can be tremendous. Here—as in many "single asset cases," enforcement of the Debtor's pre-petition waiver of the protection of the automatic stay could quickly foretell the end of the Debtor's case. If the Debtor's single asset ... passes from the bankruptcy estate through foreclosure, the Debtor, it can easily be seen, will have no realistic opportunity to attempt to formulate a repayment or reorganization plan.
>
> *In re Jenkins Court Assoc. Ltd. P'ship,* 181 B.R. 33, 37 (Bankr.E.D.Pa.1995)

Apart from the factual differences, however, I find Karabu's reliance on *Atrium* ineffective for the same reason that the *Atrium* court itself concluded that relief from stay was inappropriate, i.e., the rights of third-party creditors. As discussed in *Atrium:*

> As to the third-party creditor issue, there is no question that the automatic stay is designed to protect debtors and creditors alike. A waiver by the debtor cannot bind third parties. As Judge Bishop held in *In re Cheeks* ...:
>
> > Enforcement of a forbearance agreement does not in itself mean that in all bankruptcy cases where one exists,

the automatic stay will be lifted. These agreements do not oust this Court's Jurisdiction to hear objections to stay relief filed by other parties in interest. . . .

*Atrium,* 189 B.R. at 607 *quoting In re Cheeks,* 167 B.R. at 819.

I find that enforcing a prepetition agreement to waive the benefits of § 365 impermissibly violates the rights of third-party creditors. *Accord In re South East Fin. Assoc.,* 212 B.R. 1003, 1005 (Bankr. M.D.Fla.1997) (prepetition waivers are not self-executing and are not binding on third parties; if waiver adversely affects other creditors it is unlikely to be enforced).

The interests of third party creditors is at the core of § 365. Even more so than the protections of the automatic stay which serve to protect the debtor from piecemeal dismemberment, the ability to reject an executory contract is rooted in the principle of maximizing the return to creditors by permitting a debtor in possession to renounce title to and abandon burdensome property if such action is in the best interests of the estate. *In re Taylor,* 103 B.R. 511, 516 (D.N.J.1989). It is a fundamental right of the bankruptcy system because it provides a mechanism through which severe financial burdens may be lifted while the debtor proceeds to reorganization. *See Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.),* 208 F.3d 498, 504–05 (5th Cir.2000). That TWA is seeking to

---

**4.** I also note that the public policy on which court's rely when enforcing prepetition stay waivers is not applicable to the present facts. Courts that enforce prepetition waivers do so because of the "compelling reason for enforcement of [a prepetition waiver which] is to further the public policy in favor of encouraging out-of-court restructuring and settlement ... Bankruptcy courts may be an appropriate forum for resolving many of society's problems, but some disputes are best decided through other means." *In re Cheeks,* 167 B.R. at 819. The Ticket Agreement and its Waiver Provisions are a product of TWA II, i.e., a prior prepackaged bankruptcy case. The bankruptcy court has been and continues to be the parties' selected forum for resolving TWA's disputes. Enforcing the waiver against TWA in the present case therefore would not further the public policy in favor of encouraging out-of-court restructuring.

sell substantially all its assets rather than propose a standalone reorganization plan does not lessen the importance of the rejection power. *See In re G Survivor Corp.*, 171 B.R. 755, 758 (Bankr.S.D.N.Y. 1994) (discussing right to reject executory contract as part of sale of debtor's business in chapter 11 and noting that such sales are not uncommon and that they "usually close after the debtor has successfully rejected contracts deemed undesirable by the purchaser") *aff'd* 187 B.R. 111 (S.D.N.Y.1995). Indeed, "[a] debtor may reject a contract to make itself more attractive to a buyer" thereby maximizing the benefit to the estate by obtaining the highest possible bid for the business. *In re G. Survivor Corp.*, 171 B.R. at 759 *citing In re Maxwell Newspapers, Inc.*, 981 F.2d 85 (2d Cir.1992). To enforce a prepetition contractual agreement to waive this right is simply incompatible with the basic purpose of chapter 11.

Indeed, the Ticket Agreement itself recognizes (by attempting to circumvent) third party rights in the assumption and rejection process. Section 15(a) of the contract not only purports to prohibit TWA from filing a motion to reject, but also requires TWA not to "support any motion made by a third party seeking to force a rejection" of the Agreement. Similarly, § 15(c) requires TWA to oppose any motion made by someone else seeking rejection of the Agreement if Karabu requests TWA to assume the Ticket Agreement. Indeed, in its letter of January 12, 2001, Karabu directs TWA to "Section 15(a) of the Agreement setting forth TWA's agreement not to seek to reject the Agreement and not to support the motion of a *third party seeking* to force a rejec-

tion of the Agreement." (Emphasis added). These provisions in the Ticket Agreement and Karabu's letters are an implicit acknowledgment by Karabu of the rights of other creditors in the assumption / rejection process.

I hold that TWA's prepetition agreement to waive its debtor-in-possession authority to assume or reject an executory contract under § 365 is contrary to the purpose of chapter 11 and unenforceable.

## II. RES JUDICATA.

▇ Karabu makes the additional argument that the res judicata effect of the 1995 Confirmation Order bars TWA from rejecting the Ticketing Program. Karabu maintains that the 1995 Confirmation Order relied on the Extension Agreement and thereby approved the Ticket Agreement. From this it concludes that the 1995 Confirmation Order is binding as to any issue that could have been raised pertaining to the enforceability of the Waiver Provisions of the Ticket Agreement. According to Karabu, "[i]f TWA had objections to the restriction on rejection under Section 365(a) contained in the [Ticket Agreement], it could have—and, indeed, was required to have—raised them in 1995 before the Missouri Bankruptcy Court." Karabu Opp. at 14, ¶ 28. For a number of reasons I disagree.

▇ Claim preclusion,[5] or res judicata, requires (1) a final judgment on the merits in a prior suit involving (2) the same parties or their privities and (3) a subsequent suit based on the same cause of action. *Eastern Minerals & Chemicals Co. v. Mahan*, 225 F.3d 330, 336 (3d Cir.

---

**5.** Karabu alleges res judicata only, not the narrower principle of collateral estoppel. "Whereas res judicata forecloses all that which might have been litigated previously, collateral estoppel treats as final only those

questions actually and necessarily decided in a prior suit." *Brown v. Felsen*, 442 U.S. 127, 139 n. 10, 99 S.Ct. 2205, 2213, 60 L.Ed.2d 767 (1979).

2000); *CoreStates Bank, N.A. v. Huls America,* 176 F.3d 187, 205 (3d Cir.1999). A confirmation order is a final judgment to which claim preclusion may apply. *Huls,* 176 F.3d at 205; *Donaldson v. Bernstein,* 104 F.3d 547, 554 (3d Cir.1997); *In re Szostek,* 886 F.2d 1405, 1408 (3d Cir.1989) ("[a] confirmation order is res judicata as to all issues decided or which could have been decided at the hearing on confirmation").

■■■■■ The res judicata effect of a confirmation order, however, does not bar claims based on post-confirmation acts. *Huls,* 176 F.3d at 204; *Donaldson,* 104 F.3d at 555. Thus, even if the issue is of a type that theoretically could have been raised in the prior proceeding (presumably the enforceability of the Waiver Provision in the present controversy), claim preclusion only applies if the particular claim at issue *actually could have been brought* during the prior proceeding. *Huls,* 176 F.3d at 204 *citing Labelle Processing Co. v. Swarrow,* 72 F.3d 308, 314 (3d Cir.1995) ("New facts (i.e., events occurring after the events giving rise to the earlier claim) may give rise to a new claim, which is not precluded by the earlier judgment"). "Whether a claim could have been brought in a bankruptcy confirmation proceeding depends on whether the claim is based on pre-confirmation or post-confirmation acts." *Huls,* 176 F.3d at 205.

Karabu ignores two key facts which bar application of claim preclusion to the present controversy. First, Karabu, not TWA, is the party attempting to enforce the Waiver Provision. Thus, Karabu has a claim against TWA, not TWA against Karabu, and Karabu is the party responsible for raising the issue of enforcing the Waiver Provision in this and the prior proceeding. It is Karabu's purported cause of action against TWA that is at issue. Karabu's assertion that TWA was required to object to the Waiver Provisions in 1995 to preserve TWA's ability to breach the Waiver Provision in 2001 lacks both sense and merit.

■■■■■ Second, TWA's attempted rejection of the Ticket Agreement is a post-confirmation act. Karabu therefore cannot rely on the res judicata effect of the 1995 Confirmation Order because Karabu had no claim under the Ticket Agreement that it could have brought during the TWA II confirmation proceedings, i.e., Karabu's present claim is not based on a cause of action it could have brought in TWA II because Karabu's present cause of action did not exist in 1995. *Accord Mahan,* 225 F.3d at 337 ("Claim preclusion only bars claims arising from the same cause of action previously raised, not every conceivable claim that could have been brought in the context of a bankruptcy case"); *Huls,* 176 F.3d at 205 (a claim which arises from and after confirmation is not barred by the event of confirmation). "A cause of action accrues only when one has the right to institute suit." *Bernstein v. Donaldson (In re Insulfoams, Inc.),* 184 B.R. 694, 705 (Bankr.W.D.Pa.1995) (citations omitted) *aff'd sub nom Donaldson v. Bernstein,* 104 F.3d 547 (3d. Cir.1997). Generally, "one has the right to institute a suit when a wrong has been done, a duty has been breached, or an injury has been inflicted." *In re Insulfoams, Inc.,* 184 B.R. at 705 (citations omitted).

TWA did not breach the Waiver Provision of the Ticket Agreement until January 26, 2001, when it filed its present motion to reject. Accordingly, Karabu had no claim to enforce the Waiver Provision until January 26, 2001. Therefore it had no cause of action under the Ticket Agreement which it could have brought in 1995 and to which claim preclusion can apply. This is of course, just another way of saying that the res judicata effect of a

confirmation order does not apply to a claim which arises post-confirmation.[6] *Huls*, 176 F.3d at 204–05; *Donaldson*, 104 F.3d at 555 ("Creditors whose claims arise from and after confirmation are not barred by the event of confirmation from asserting such claims, except to the extent that they arise from preconfirmation acts"); *see also Mahan*, 225 F.3d at 337–38 ("we conclude that a claim should not be barred unless the factual underpinnings, theory of the case, and relief sought against the parties to the proceeding are so close to a claim actually litigated in the bankruptcy that it would be unreasonable not to have brought them both at the same time in the bankruptcy forum").

However, even if Karabu could have raised a claim under the Ticket Agreement in TWA II, Karabu fails to establish the first requirement of res judicata. The 1995 Confirmation Order simply is not a judgment on the merits of the enforceability of the Ticket Agreement or its Waiver Provisions. The evidence does not support Karabu's assertion that the Missouri Court relied on the Ticket Agreement when it entered the 1995 Confirmation Order. Neither the Ticket Agreement nor the Waiver Provisions were cited in the 1995

Confirmation Order nor were they otherwise put in dispute during the confirmation hearing. Consequently, Karabu cannot establish a final judgment on the merits of the claim at issue and claim preclusion does not apply. *Cf. Enter. Energy Corp. v. United States (In re Columbia Gas Sys.)*, 50 F.3d 233, 238 (3d Cir.1995) (allowing debtor to reject court approved settlement agreement under § 365 and noting that "[t]he core of this settlement agreement was consensual obligations. The parties crafted the agreement and the court approved it. There is no judgment on the merits . . . . . . Furthermore, the rights and obligations of the parties do not derive solely from the court's judgment, but depend . . . on the performance of the other party.")

### III. BUSINESS JUDGMENT FOR REJECTION OF AGREEMENT.

 A debtor's determination to reject an executory contract is governed by the business judgment standard. *Group of Inst. Investors v. Chicago, Milwaukee, St. Paul, and Pacific R. Co.*, 318 U.S. 523, 550, 63 S.Ct. 727, 743, 87 L.Ed. 959 (1943) ("Thus, the question whether a lease

---

**6.** This distinction is explained by the Third Circuit in *Huls*. The case involved a dispute between two creditors (Huls and CoreStates) over a $600,000 payment the debtor (UCT) made to Huls pursuant to the debtor's confirmed plan but allegedly in violation of a preconfirmation subordination agreement between Huls and CoreStates. The Court wrote:

> Because (a) UCT gave the $600,000 to Huls; (b) CoreStates was aware of this; and (c) CoreStates had demanded the money, all before the confirmation order was issued, we conclude that CoreState's cause of action based on the Subordination Agreement had accrued before the confirmation was finalized. The key fact here is that UCT paid the $600,000 to Huls before the confirmation of the Second Amended Plan. CoreState's cause of action could not ac-

crue until Huls received money from UCT, since Huls could not breach the Agreement until it received money from UCT and then refused to turn it over to CoreStates. If Huls had not received the $600,000 payment until after the Plan was confirmed, CoreStates could not have raised its claim under the Agreement in the bankruptcy proceeding and it would not be precluded from raising it now. In the present case, however, Huls received money from UCT and in fact failed to turn it over to CoreStates in response to CoreState's demands, all before the final confirmation of the Second Amended Plan. Therefore, we agree with the . . . conclusion that CoreStates could have raised its present claim in the bankruptcy proceeding.

> 176 F.3d at 205.

should be rejected and if not on what terms it should be assumed is one of business judgment"). This business judgment standard is widely accepted. *See In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3rd Cir.1992) (holding *in dicta* that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39–40 (3rd Cir.1989); *N.L.R.B. v. Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3rd Cir.1982) (noting that the "usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test") *aff'd*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). See also *Glenstone Lodge, Inc. v. Buckhead America Corp. (In re Buckhead America Corp.)*, 180 B.R. 83 (D.Del.1995) where the district court upheld the bankruptcy court's granting of a motion to assume certain franchise agreements, noting that:

> In addition, by barring the claims of non-responding franchisees, the bankruptcy court was able to meet its requirement to find, prior to granting the assumption motion, that assumption of each franchise agreement was a reasonable exercise of the debtor's business judgment.

180 B.R. at 88.

A debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of "bad faith, or whim or caprice." *Wheeling–Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling–Pittsburgh Steel Corp.)*, 72 B.R. 845, 849–50 (Bankr.W.D.Pa.1987).

Karabu asserts that the rejection motion should be denied because (1) TWA's management needlessly entered bankruptcy and then sought to reject the Ticket Agreement in bad faith as part of a scheme to protect management's own financial interests, including benefits by way of employment retention and bonuses in connection with the proposed transaction with American; and (2) rejection is not in the best interests of unsecured creditors because Karabu will have a rejection damages claim so large that it will severely dilute the claims of other unsecured creditors.

At the hearing held before Chief Judge Robinson on January 26–27, 2001, Karabu made similar allegations of management bad faith. The evidence does not support Karabu's assertion. When TWA filed its chapter 11 petition, the only apparent alternative to the American transaction was a piecemeal liquidation. I elaborated on this point in my ruling of February 21, 2001 in denying Continental Airline's motion for a stay pending appeal. 02/21/01 Tr. at 41–43.

Claiming that it will have an enormous damage claim if the Ticket Agreement is rejected, Karabu faults TWA for having made "no effort to alert creditors to the disastrous impact of a rejection of the Karabu Contract on holders of the unassumed unsecured claims against TWA." Karabu Opp. at p. 3, ¶ 5. However, the Committee has considered the ramifications of rejection of the Ticket Agreement, as well as the alternatives. Having done so, the Committee has come to a different conclusion as to what is in the creditors' best interests, and has joined in the motion to reject the Ticket Agreement. Karabu's claim that both TWA and the Committee have made an unwise decision as to what is in the best interests of creditors and TWA's other constituents is insufficient as a matter of law to deny the exercise of TWA's business judgment in seeking to reject an executory contract. *See, e.g., Wheeling–Pittsburgh*, 72 B.R. at 849 ("...whether the debtor is making the best or even a good business decision is

not a material issue of fact under the business judgment test").

The Committee has expressed the view that if the Ticket Agreement is not rejected as part of the American transaction or some other similar alternative transaction, it is unlikely that a strategic partner could be found willing to assume the Ticket Agreement that drains revenues and impairs financial planning and operations. This view is supported by Compton's unrefuted testimony that the Ticket Agreement impeded TWA's efforts to find a strategic partner during the years preceding TWA's present bankruptcy.

I find Karabu's argument that TWA's rejection of the Ticket Agreement should be subject to heightened scrutiny unavailing. There simply is no evidence of an improper insider aspect to TWA's exercise of its rejection rights under § 365 (e.g., a link between the management retention incentive and successful rejection of the Ticket Agreement). Nor does the case on which Karabu relies support its position. *See Westship, Inc. v. Trident Shipworks, Inc.*, 247 B.R. 856 (M.D.Fla.2000). The *Westship* case involved an assumption of leases under § 365 where the landlord had some connection with the debtor-tenant. *Id.* at 865. In discussing the appropriate standard under § 365, the court adopted the "business judgment rule" despite the insider connection. The court noted that the concept of "strict scrutiny" under § 365 is "not supported by the case law." *Id.* It then concluded that even with alleged insider influence in the assumption and rejection process, "it is not even clear that the law requires heightened scrutiny, although it was prudent of the Bankruptcy Court to look closely at the assumption [of the leases]" under the circumstances. *Id.*

Karabu asserts the harm that would result to the unsecured creditors would be great because Karabu's resulting damage claim "will likely exceed hundreds of millions of dollars." Karabu Opp. at p. 3, ¶ 5 and p. 17, ¶ 36. However, Karabu makes no effort to substantiate this assertion and I assume that the Committee, in the exercise of its fiduciary duty and in joining in the rejection motion, has made its own assessment of this assertion and found it wanting.

I conclude that Karabu has not made out a case of bad faith or improper insider benefit and therefore the business judgment of TWA, supported by the Committee, is entitled to the appropriate deference of this Court in allowing the rejection.

## IV. THE HARM CAUSED TO KARABU BY TWA'S REJECTION.

Karabu argues that by rejecting the Ticket Agreement TWA will cause the termination of the business of Lowestfare.com, a Karabu affiliate, which employs as many as 750 persons. According to Karabu, this Court must perform a balancing test and not allow a rejection which would cause such serious harm to the non-debtor party to a contract. The difficulty with Karabu's position is that it ignores the likely result of not rejecting the Ticket Agreement and it ignores the case law authority in this Circuit and elsewhere.

If Karabu succeeds in preventing rejection, then TWA will likely not be able to complete a § 363 going-concern sale of substantially all of its assets. In a piecemeal liquidation, the Ticket Agreement, which no airline would likely assume, would then be rejected. Thus, a successful opposition to TWA's motion to reject would result in little or no legitimate benefit to Karabu or the employees of Lowestfare.com—while likely inflicting serious harm upon TWA's creditor constituents, including its employees.

Courts in this Circuit that have addressed whether the potential burden imposed on a nondebtor party should be a factor in considering whether to permit the rejection have declined to undertake such an inquiry as irrelevant and unnecessary. *See In re Patterson,* 119 B.R. 59, 61 (E.D.Pa.1990) (fairness to the nondebtor party is irrelevant in determining whether debtor may reject contract); *Wheeling–Pittsburgh,* 72 B.R. at 849 (effect of rejection on nondebtor party is unnecessary in determining propriety of debtor's decision to reject contract).

 The cases cited by Karabu for the proposition that a rejection motion involves a balancing of interest test are inconsistent with the reported decisions in this Circuit (see above) and the long standing position of this Court that in a rejection motion determination the focus is the benefit to the debtor's estate.[7]

## CONCLUSION

For the reasons set forth above, I will grant TWA's motion to reject the Ticket Agreement. Section 365(a) grants a debtor in possession the fundamental authority to assume or reject an executory contract as a vital part of the bankruptcy process. The Debtor cannot waive this right simply by entering into a prepetition contractual agreement with one of its creditors. TWA has decided, based on its business judgment and as joined by the Committee, that rejection is in the best interest of the estate and its decision is entitled to the appropriate deference by this Court. Finally, Karabu has not established the elements of either judicial estoppel or res judicata and I overrule its objections based on these doctrines.

## ORDER

For the reasons set forth in the Court's memorandum opinion of this date, the Motion for Entry of an Order Authorizing Trans World Airlines, Inc. to Reject Karabu Ticket Program Agreement Pursuant to Section 365(a) of the Bankruptcy Code (Doc. # 255) is hereby GRANTED.

---

7. I note that several of the cases relied upon by Karabu are simply inapposite. *See, e.g., In re Meehan,* 46 B.R. 96 (Bankr.E.D.N.Y.1985) (refusing to approve individual debtor's rejection of land sale contract where: (1) debtor's creditors to be paid 100% of their claims with or without rejection and (2) state court directed specific performance prior to commencement of case), *aff'd,* 59 B.R. 380 (E.D.N.Y. 1986); *Robertson v. Pierce (In re Chi–Feng Huang),* 23 B.R. 798, 803 (9th Cir. BAP 1982) (noting that rejection may not be warranted if the creditors will receive 100% of their claims even without rejection). The business judgment rule is followed by the majority of courts. *See, e.g., Borman's, Inc. v. Allied Supermarkets, Inc.,* 706 F.2d 187, 189 (6th Cir. 1983) (bankruptcy court "need determine only ... whether disaffirmance would be advantageous to the debtor"); *In re Federated Dep't Stores, Inc.,* 131 B.R. 808, 812–13 (S.D.Ohio 1991) (rejecting *In re Meehan* and

*In re Chi–Feng Huang* to the extent the cases stand for a "balancing of interests" test); 6A Norton Bankr.L. & Prac.2d § 150:2 n. 12 ("The 'business judgment' rule is followed by most courts"). Courts reject or disagree with the other cases Karabu cites. *E.g., Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.),* 756 F.2d 1043, 1047–48 (4th Cir.1985) (adopting business judgment rule and rejecting balancing of equities test); *In re A.J. Lane. & Co., Inc.,* 107 B.R. 435, 440–41 (Bankr.D.Mass. 1989) (Queenan, J.) (applying business judgment rule and rejecting balancing test of *Infosystems Technology, Inc. v. Logical Software, Inc.,* No. CIV.A. 87–0042, 1987 WL 13805 (D.Mass. June 25, 1987) and *In re Midwest Polychem Ltd.,* 61 B.R. 559 (Bankr.N.D.Ill. 1986)); *In re Logical Software, Inc.,* 66 B.R. 683, 686–87 (Bankr.D.Mass.1986) (rejecting balancing test in *In re Petur U.S.A. Instrument Co.),* 35 B.R. 561 (Bankr.W.D.Wash.1983).